UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                              Plaintiff,                    Case No. 13-20764

v.                                                         District Judge
                                                           Paul D. Borman

MARVIN NICHOLSON, *et al.*,                                Magistrate Judge
                                                           David R. Grand

                              Defendants.
_____/

## REPORT AND RECOMMENDATION TO DENY PETITIONER'S MOTION UNDER § 2255 TO VACATE, SET ASIDE, OR CORRECT SENTENCE (ECF Nos. 780, 835)

Before the court is *pro se* Petitioner Marvin Nicholson's ("Nicholson") Motion under §

2255 to Vacate, Set Aside, or Correct Sentence and memorandum in support. (ECF No. 780.) The

government filed a response (ECF No. 786), and Nicholson filed a reply. (ECF No. 801.)[1] Also

before the Court is Nicholson's "Motion of Addendum," which seeks to add an additional

argument to his underlying § 2255 motion. (ECF No. 835.) Both motions, which the Court will

address together, have been referred to the undersigned for a Report and Recommendation

pursuant to 28 U.S.C. § 636(b)(1)(B).

## I.    RECOMMENDATION

For the reasons set forth below, **IT IS RECOMMENDED** that Nicholson's Motion under

§ 2255 to Vacate, Set Aside, or Correct Sentence **(ECF Nos. 780, 835)** be **DENIED**.

---

[1] Nicholson also submitted a letter on August 28, 2019 (filed September 9, 2019), in which he provided supplemental authority and arguments which the Court will consider herein.

## II.   REPORT

### A.   Background

The Phantom Motorcycle Club ("PMC") is an "outlaw" motorcycle club that has chapters in Michigan and numerous other states, with Detroit being the "mother chapter." (ECF No. 751, PageID.11395.)  As an outlaw motorcycle club, PMC has a hierarchical structure with the following purposes: preserving and protecting the power, territory and reputation of the club, promoting and enhancing the club and its members and associates' activities, maximizing profits, and extorting money from other clubs. (*Id.*; ECF No. 201, PageID.1664.)  Nicholson was a "national enforcer" in the role of protecting members, including the national president, Antonio Johnson, who is a co-defendant in this case. (ECF No. 751, PageID.11396.)

Phantom members wore leather vests or jackets ("rags" or "colors") with a Phantom emblem on the back. (*Id.*; PageID.11394-95; ECF No. 201, PageID.1664.)  Other outlaw and regular motorcycle clubs also have rags or colors that are distinctive to their organizations. (*Id.*) Rags are of significant value to the Phantoms and other motorcycle clubs, so much so that members of clubs will attempt to rob rags from other clubs to exert their dominance. (*Id.*)  There were many allegations of criminal conduct by Nicholson between 2009 and October of 2013, including that he stole and possessed stolen motorcycles, stole rags from rival members at gun point, plotted to murder and/or assault members of rival clubs, possessed firearms, and shot at ATF agents and task force officers as they were executing a search warrant at his residence. (ECF No. 201, PageID.1669-73.)

#### i.   The Charges

The charges in this case arise out of a series of confrontations between Phantom Motorcycle Club and rival motorcycle clubs. (ECF No. 751, PageID.11395.)  Nicholson was

initially indicted on October 16, 2013.  (ECF No. 8.)  The operative third superseding indictment

charged Nicholson with the following:

- Count One (1), RICO Conspiracy, in violation of 18 U.S.C. § 1962(d);

- Count Five (5), Assault with a Dangerous Weapon in Aid of Racketeering, in violation of U.S.C. § 1959(a)(3) §2;
- Count Six (6), Conspiracy to Assault with a Dangerous Weapon in Aid of Racketeering, in violation of 18 U.S.C. § 1956(a)(6);

- Count Seven (7), Use and Carry of a Firearm During, and in Relation to a Crime of Violence, in violation of 18 U.S.C. § 924(c);

- Count Eight (8), Conspiracy to Commit Murder in Aid of Racketeering, in violation of 18 U.S.C. § 1959(a)(5);

- Count Nine (9), Assaulting, Resisting, or Impeding Certain Officers or Employees with a Dangerous Weapon, in violation of 18 U.S.C. § 111(b);

- Counts Ten (10) and twelve (12), Felon in Possession of a Firearm, in violation of 18 U.S.C. § 922(g)(1); and

- Count Eleven (11), Use and Carry of a Firearm During, and in Relation to, a Crime of Violence, in violation of 18 U.S.C. § 924(c).

(ECF No. 201, PageID.1657-1683.)

> ii.    *Jury Trial and Conviction*

Nicholson and some of his co-defendants were tried before a jury in the Eastern District of

Michigan.  The trial took place from February 3, 2015 to March 4, 2015, and the government

presented two dozen or so witnesses.  (ECF Nos. 439-465.)   A significant amount of witness

testimony related to Nicholson's participation in PMC.  In its opinion upholding Nicholson's

convictions, the Sixth Circuit provided the following description of the salient facts:

> The charges and convictions in this case stem from a series of PMC confrontations with rival motorcycle clubs.  PMC is an "outlaw" motorcycle club that has chapters in Michigan, Ohio, and six other states.  The Detroit chapter is the "mother chapter."  PMC has a hierarchical structure, with a national president, vice-president, enforcers, and treasurer. Each chapter also has a chapter president and vice-president.  PMC has a set of by-laws,

3

members are required to pay dues, and chapters pay money to the national treasurer.

PMC places high value on being the toughest, or "baddest," outlaw motorcycle club. One way to establish this dominance is to take the leather vests worn by members of rival clubs (known as "rags"), which are important symbols in motorcycle club culture. This is considered the ultimate sign of disrespect. PMC members are not allowed to let rivals take their own rags, and they must resist with force or use violence to get them back. PMC's rival motorcycle clubs in the Detroit area include Hell Lovers and Satan's Sidekicks.

* * *

The jury heard testimony that [Bryan] Sorrell shot Satan's Sidekick member Leon McGee after PMC president Johnson instructed PMC members to take Satan's Sidekicks' rags and that [another co-defendant] participated in the fight at a Hell Lovers' party on Johnson's orders and periodically supplied guns to other Phantoms.

* * *

The prosecution introduced sufficient evidence that Johnson, Nicholson, [and two other co-defendants] were involved in a conspiracy with other Phantoms that included an agreement to commit at least two predicate acts. The evidence at trial showed that Johnson served as PMC national president beginning in 2009, ordered the confrontation in Cleveland with the Zulus in 2009, the Omens in 2010, the Satan's Sidekicks in 2013 (which led to the shooting of Leon McGee), and directed the plot to murder Hell Lovers. Nicholson served as a national enforcer and participated in the raid on the Zulus, the hunt for Sidekicks that led to the McGee shooting, and the plot to murder Hell Lovers.

* * *

In September 2013, after members of Satan's Sidekicks disrespected Johnson, Johnson instructed PMC members to take Sidekicks' rags by force. PMC members gathered at the PMC clubhouse (Nicholson, Jackson, Sorrell, and Brown were all present) and from there left to track down Sidekicks. Although the mission was to steal rags, several Phantoms, including Sorrell, were armed, and at one point Nicholson asked [government informant] Miller whether everyone was armed, and Miller responded that Brown was bringing his gun. Nicholson, Sorrell, and [Sherman] Brown, along with other PMC members, staked out a rival's clubhouse, and when Leon McGee emerged, Sorrell and another Phantom attacked. Sorrell punched McGee, and McGee stabbed Sorrell, at which point Sorrell shot McGee.

Johnson, Nicholson, and Sorrell were convicted of assault with a dangerous weapon in aid of racketeering and conspiracy to assault with a dangerous weapon in aid of racketeering, or aiding and abetting those offenses, related to the shooting of Leon McGee. . . . Nicholson attended the PMC meeting before the assault on McGee, specifically asked whether Phantoms brought guns, and was present at the scene of the shooting. . . . From this evidence, a rational jury could conclude that [Nicholson was] guilty of assault with a dangerous weapon in aid of racketeering and infer a conspiracy to do the same.

\* \* \*

All defendants except [one of Nicholson's co-defendants] were convicted of conspiracy to commit murder in aid of racketeering related to the PMC plot to murder Hell Lovers.  After PMC member Steven Caldwell was murdered while riding his motorcycle in late September 2013, PMC president Johnson held a meeting in which he called for retaliation against Hell Lovers—the suspected culprits.  At the meeting—with Nicholson, Sorrell, Jackson, and Brown all in attendance—Johnson announced a plan to murder three Hell Lovers, which would cause other Hell Lovers to travel to Michigan for the funerals, at which time PMC would attack and kill a large number of them. Nicholson dispensed orders to PMC members to carry out the first murder, and Nicholson and other PMC members began preparations.  Nicholson's [] direct involvement in the conspiracy easily meet[s] the sufficiency standard.

\* \* \*

Johnson, Nicholson, and Sorrell next challenge their convictions under 18 U.S.C. § 924(c) for using or carrying a firearm during and in relation to a crime of violence, or aiding and abetting that offense, related to the McGee shooting.  To be convicted of violating § 924(c) under an aiding and abetting theory, a defendant must have advance knowledge that the plan would include a firearm.  *Rosemond [v. United States*,] 134 S. Ct. at 1249.  This advance-knowledge requirement does not mean that a defendant must know in advance that his confederate will *actually use* the gun.  Instead, the government must show that the defendant "decided to join in the criminal venture . . . with full awareness of its scope . . . including its use of a firearm." *United States v. Johnson*, No. 16-2063, 2017 WL 3263744, at \*8 (6th Cir. Aug. 1, 2017) (quoting *Rosemond*, 134 S. Ct. at 1249).

Sorrell, Nicholson, and Johnson each argue that they did not have this requisite advance knowledge because the McGee incident was not supposed to involve a gun fight, and instead Phantoms were only supposed to steal Sidekicks' rags.  We disagree.  First of all, there is overwhelming evidence— including Sorrell's own statements caught on recording—that Sorrell

actually shot McGee.  Thus, there is no reason to even rely on aiding and abetting liability for Sorrell.  Second, before the assault, Nicholson asked Miller whether other PMC members were carrying weapons, and as a result knew that at least one Phantom would be bringing his gun.  Lastly, the government presented evidence at trial that prior raids ordered by Johnson included firearms and that Johnson was aware that PMC members usually carried firearms on such raids.  *See United States v. Soto*, 794 F.3d 635, 662 (6th Cir. 2015).  Viewing the evidence in the light most favorable to the government, a rational jury could thus conclude that Johnson knew in advance that the raid on Sidekicks would include firearms.  *See Johnson*, No. 16-2063, 2017 WL 3263744, at *8.  There was sufficient evidence presented at trial to sustain each defendant's § 924(c) conviction.

* * *

Nicholson challenges his conviction for assaulting and resisting a federal officer with a dangerous weapon in violation of 18 U.S.C. § 111(b) and the associated firearm violation under 18 U.S.C. § 924(c) for firing shots on ATF agents who were executing a search warrant at his house on October 4, 2013.[2] Nicholson claims he did not know the people he fired on were federal agents. However, § 111(b) does not require that the defendant know the person he is assaulting is a federal officer—it just requires an intent to assault.  []  Moreover, the search teams used vehicles with flashing police lights, and agents knocked and announced their presence repeatedly before breaching Nicholson's front door.  There is sufficient evidence to sustain this conviction.

(ECF No. 751, PageID.11394-408.)

---

[2] A Bureau of Alcohol, Tobacco, Firearms and Explosive ("ATF") Special Response Team was executing a search warrant at Nicholson's home.  (ECF No. 460, PageID.5200.)  After ATF attempted—three times—to gain entry via knocking and announcing that they were there with a search warrant without any response, the special response team proceeded to complete a forceful breach of the property with a ram per standard protocol.  (*Id.*, PageID.5202.)  As ATF was entering the property, they heard gunshots.  (*Id.*)  The gunfire came from the back of the residence.  (ECF No. 462, PageID.5378.)  Found at the back of the residence were several individuals, including Nicholson, who was in possession of a firearm.  (*Id.*; ECF No. 640, PageID.5202.)  Based on these facts, the jury convicted Nicholson, and others, of assaulting a federal law enforcement officer, and using or carrying a firearm during and in relation to the assault.  (ECF No. 201, PageID.1682-83; ECF No. 469, PageID.5842.)

### iii.    Sentencing

At sentencing, the Honorable Paul D. Borman, who presided over Nicholson's trial, explained that the two § 924(c) charges – Counts Seven and Eleven, Use and Carry of a Firearm During, and in Relation to a Crime of Violence – carried mandatory minimum sentences of 10 and 25[3] years, respectively, which sentences would run consecutively not only to one another (*i.e.*, 35 years (420 months) as to those two convictions alone), but also to any other sentence the Court would impose as to the other Counts of which Nicholson was convicted.  (ECF No. 706, PageID.9335.)  As to those other Counts, the Court confirmed that the guideline range was 235 to 293 months.  (*Id.*)  This amounted to between 655 to 713 months imprisonment total.  (*Id.*)  The government, at sentencing, requested 660 months of imprisonment.  (*Id.*, PageID.9335.)  The district court sentenced Nicholson to a below guideline sentence of 480 months comprised of the mandatory minimum thirty-five (35) year (420-month) sentence on the two § 924(c) convictions and a sixty-month sentence on Nicholson's other Counts of conviction.  (ECF No. 602; ECF No. 706, PageID.9362-63, 9365.)

### iv.    Appeal and § 2255 Motion

On August 13, 2015, Nicholson unsuccessfully appealed his conviction and sentence to the United States Court of Appeals for the Sixth Circuit (ECF No. 751.)  Nicholson filed a Petition for Writ of Certiorari with the U.S. Supreme Court that was denied on April 4, 2018.  (ECF No. 753.)  He then filed the instant § 2255 motion on February 27, 2019.  (ECF No. 780.)  In his instant §

---

[3] At the time of Nicholson's offenses, conviction, and sentencing, § 924(c)(1)(C)(i) provided: "In the case of a second or subsequent conviction under this subsection, the person shall ... be sentenced to a term of imprisonment of not less than 25 years." 18 U.S.C. § 924(c)(1)(C)(i) (effective Oct. 6, 2006, to Dec. 20, 2018).  (*See also* ECF No. 333, PageID.1496) ("In the event that [Nicholson] is convicted on Count Seven, he would face a minimum sentence of twenty-five (25) years to be served consecutive to any term of imprisonment imposed for a crime of violence . . .").

7

2255 motion, Nicholson raises three issues: (1) his trial counsel provided ineffective assistance when he misinformed Nicholson regarding the maximum sentence exposure he faced at trial versus entering a guilty plea; (2) his appellate counsel was ineffective by failing to raise a claim based on *Dean v. United States*, 137 S.Ct. 1170 (2017), which the United States Supreme Court decided on April 3, 2017, *after* Nicholson was convicted and *after* his attorney filed his appellate brief; and (3) Counts Seven and Eleven "fail to categorically qualify as 'crimes of violence' for the purposes of § 924(c)."  In his Motion of Addendum, Nicholson argues that in light of the U.S. Supreme Court's decision in *Rehaif v. United States*, 139 S.Ct. 2191 (2019), "his conviction and punishment were for an act that the law did not make criminal."  (ECF No. 835, PageID.11801.)

### B.    Legal Standards

Under 28 U.S.C. § 2255, a prisoner sentenced by a federal court may "move the court which imposed the sentence to vacate, set aside or correct the sentence" based on a claim "(1) 'that the sentence was imposed in violation of the Constitution or the laws of the United States;' (2) 'that the court was without jurisdiction to impose such sentence;' (3) 'that the sentence was in excess of the maximum authorized by law;' or (4) that the sentence 'is otherwise subject to collateral attack.'"  *Hill v. United States*, 368 U.S. 424, 426-427 (1962).  To prevail on a § 2255 motion, "a petitioner must demonstrate the existence of an error of constitutional magnitude which has a substantial and injurious effect or influence on the guilty plea or the jury's verdict." *Humphress v. United States*, 398 F.3d 855, 858 (6th Cir. 2005).  A § 2255 petitioner seeking to set aside his sentence has the burden of establishing his case by a preponderance of the evidence. *McQueen v. U.S.*, 58 Fed. App'x 73, 76 (6th Cir. 2003).

8

C.      **Analysis**

        1.      *Ineffective Assistance of Counsel at Trial*

Nicholson's first argument is that "[t]rial counsel provided ineffective assistance when he misinformed Mr. Nicholson of the maximum sentence exposure he faced at trial versus entering a guilty plea." (ECF No. 780, PageID.11526.)  Specifically, in an affidavit attached to his § 2255 motion, Nicholson asserts that the government had "extended a guilty plea offer for 30 years in prison," and that his trial attorney, Claude Chapman, "directly advised me to reject, because if I were to instead proceed to trial, according to him, I would receive no more than 35 years in prison, that is assuming I were to be found guilty at trial.  [] Based on [trial counsel's] advise [sic], I rejected the government's 30 year plea offer and instead proceeded to trial. . . . Had I truly known that I could in fact receive 40 years in prison by going to trial, I would have never rejected the government's 30 year plea offer, but instead would have entered a guilty plea by accepting the 30 year plea offer." (*Id.*, PageID.11534.)  Nicholson's argument lacks merit both legally and factually.

A petitioner seeking to establish ineffective assistance of counsel must satisfy the standards set forth by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984). First, he must show that his counsel's performance was deficient. *Strickland*, 466 U.S. at 687. "This requires showing that counsel made errors so serious that [he] was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.*  Counsel's performance is deficient only where it falls "below an objective standard of reasonableness." *Id.* at 687-88. Judicial scrutiny of counsel's performance "must be highly deferential." *Id.* at 689.  A reviewing court should avoid second-guessing counsel and must ensure that "every effort is made to eliminate

9

the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.*

Second, the petitioner must show that counsel's deficient performance prejudiced the defense. *Id.* at 687. To satisfy the prejudice prong, a petitioner must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. In the context of a case like Nicholson's, where the petitioner claims ineffective assistance of counsel regarding the rejection of a plea agreement, to meet the prejudice prong he must show that there is a reasonable probability that but for counsel's deficient performance, he not only would have pleaded guilty, but that he also would have received a less severe conviction, sentence, or both. *Lafler v. Cooper*, 566 U.S. 156, 164 (2012).

Nicholson fails to meet these standards. He failed to come forward with any admissible evidence, except for his own affidavit, that his trial counsel told him he would receive a sentence of no more than thirty-five years in prison if convicted. (ECF No. 790, PageID.11527; ECF No. 801, PageID.11614.)[4] That type of self-serving affidavit is insufficient to warrant relief because, under settled Sixth Circuit authority, "a defendant is bound by his statements given under oath at the plea hearing," and Nicholson's plea hearing statements plainly contradict his affidavit averments. *United States v. Cisneros,* 2019 WL 5457352, *27-8 (W. D. Mich., 2019) (citing *Baker v. United States*, 781 F.2d 85, 90 (6th Cir. 1986) ("Where the court has scrupulously followed the required procedure [under Rule 11 of the Federal Rules of Criminal Procedure], 'the defendant is

---

[4] In his motion, Nicholson wrote that he "intends on filing additional affidavits" from his mother and daughter in support of his claim that his trial counsel "did not correctly advise him of his maximum sentencing exposure at trial versus entering a guilty plea." (ECF No. 780, PageID.11528.) However, no such additional affidavits were filed.

bound by his statements in response to that court's inquiry.'").   Here, Nicholson repeatedly affirmed on the record that he understood the charges, potential penalties should he be convicted – a minimum of 35 years and "up to life" as to certain of the charges against him – and plea offer made to him.   (ECF No. 333, PageID.1495; ECF No. 699, PageID.9212-16; ECF No. 704, PageID.9290-92; ECF No. 780, PageID.11526-28.)   For example, during an arraignment and plea hearing held on November 7, 2014, the following exchange occurred:

> The Court:  [] why don't we begin with Mr. Nicholson. . . . Sir, the purpose of this hearing is to ask you if you have received a copy of a Rule 11 plea agreement and if you had a chance to talk it over with your lawyer and also to arraign you on the particular third superseding indictment.  So I'll start with the arraignment and then go to the next question.  So I have before me Defendant's Acknowledgement of the Arraignment[5], and on the second page above the name Marvin Nicholson there is a signature.  That's your signature, sir?
>
> DEFENDANT NICHOLSON: Yes.
>
> THE COURT: Yes, sir? Okay. And, Mr. Chapman, is that your signature?
>
> MR. CHAPMAN: Yes, it is, Your Honor.

(ECF No. 699, PageID.9213.)

The Court proceeded to discuss with Nicholson each of the charges he was facing, and the potential penalties he would face as to each charge if he were to be convicted, as stated in the Acknowledgement.  Right off the bat, the Court advised Nicholson that the "charges against you include Count 1, which is RICO conspiracy," and that it carried a potential sentence of "up to life imprisonment . . ." (*Id.*)  The Court then went through each of the other charges and penalties, noting the sentencing exposure for each, including on "Count 7, use and carry of a firearm in furtherance of a crime of violence, firearm discharged.  That has a penalty of ten-year minimum

---

[5] Nicholson's signed Acknowledgement, which tracks the charges and penalties explained to him by the Court during the hearing, appears in the record as ECF No. 333.

up to life imprisonment," and on "Count 11, use and carry of a firearm in furtherance of a crime of violence, firearm discharged.  That has a mandatory minimum of ten years to life in prison, $250,000 fine or both."  (*Id.*, PageID.9213-14.)  The Court then explained the significance of the consecutive sentences Nicholson was facing, noting, "[the Acknowledgement] also says in the event you're convicted on Count 7, which is firearm discharged while using -- in furtherance of a crime of violence, that there be a minimum sentence of 25 years to be served consecutively or on top of any other imprisonment imposed for a crime of violence.  You understand that, sir?," to which Nicholson answered "Yeah."  (*Id.*, PageID.9214.)  The Court then had the parties place on the record the terms of the Rule 11 plea that had been tendered to Nicholson for his consideration, noting the significant exposure difference between being adjudged guilty following a plea versus following a jury verdict:

> The Court:  Okay.  So if someone for the government would go sidebar and explain what the potential guideline range is and penalties and what the alternative is with regard to a Rule 11, if one has been provided.
>
> Mr. Gabel (Government):  A Rule 11 has been tendered to Mr. Nicholson.  It contemplated a plea to counts 1 and 7.  The guideline range on Count 1 was scored at 188 to 235 months, and then Count 7 is a 924(c) charge which was the discharge of a firearm, and that would be ten years consecutive to a sentence that would be imposed on Count 1.
>
> The Court:  Okay.  And so you understand, those are the penalties with regard to the plea offer that the government has made, sir?
>
> Nicholson:  Yeah.
>
> The Court:  Okay.  And **if the Defendant were to go to trial and get convicted of eight counts to which he is charged, it would be significantly higher**.  Can you explain a little bit about that?
>
> Gabel:  Yes.  Given the penalties that the Court just read off the acknowledgement, **there's one that has potential life sentence** and then **the two 924(c)s alone, if he were convicted of those, there would be *a starting point of a 35-year mandatory minimum just on those two counts*.**

> The Court:  Okay.  Hearing all that, Mr. Chapman, what is your client's preference?
>
> Chapman (Trial Attorney for Nicholson):  At this time, Your Honor, my client is not inclined to accept the agreement.  Mr. Nicholson, you have – I've shared with you a copy of the proposed Rule 11 agreement?
>
> Nicholson:  Yesterday.
>
> Chapman:  Yeah.  And do you have a copy of that agreement in your possession?
>
> Nicholson:  Yeah.
>
> Chapman:  And it is your decision to not accept that proposed Rule 11 agreement at this time?
>
> Nicholson: 16 years or something, right?
>
> The Court:  I'm sorry.
>
> Chapman:  188 months.
>
> Nicholson:  That's about 16 years.
>
> Chapman:  Approximately.
>
> Nicholson:  Nah.  No.
>
> The Court: Okay.  Very good.  We'll proceed to trial.  Thank you, sir.
>
> Nicholson:  Thank you.

(ECF No. 699, PageID.9215-16) (emphasis added.)

Additionally, at another pretrial conference, held on January 7, 2015, the Court again questioned Nicholson about his preference for trial knowing that if he were to be convicted of all charges he would be facing a **minimum** sentence of 35 years in prison, with the possibility of a **life sentence**:

> Graveline (Government):  We believe that if convicted as charged for Nicholson, his guideline range would be 360 months to life for all the other counts other than the 924(c)s.  Nicholson stands charged with two 924(c)s.

Both of them are with firearms discharged.  So he'd be looking at **ten years plus 25 years, so 35-year mandatory minimum sentence for the two 924(c)s** *plus* **for other counts, 360 to life**.

The Court: So with regard to the ten-year and the 25, those are mandatory minimums.  If he's convicted of them, I have no discretion.

Graveline: That's correct.

The Court: With regard to the other counts, then the guidelines, which are just one factor of multiple that the Court takes into consideration, are 360 to life.

Graveline: That's correct, You Honor.

The Court: But the 35 would be immediate without any discretion by the Court.

Graveline: That's correct, Your Honor.

The Court: Okay. So let me ask Chapman, I just want to make sure that your client heard that and is – wishes still to proceed to trial too.  Is that correct, sir?

Chapman: Having heard what the possible penalties are —

Defendant Nicholson: Trial, trial.

Chapman: — should you be convicted, you still wish to go to trial?

The Court: Very good. Thank you, sir.

(ECF No. 704, PageID.9290-92) (emphasis added.)

In short, Nicholson was unequivocally advised on the record that if he was convicted on all charges, he would be facing a **mandatory minimum** sentence of **thirty-five years in prison**, with the possibility of a **life sentence**.  Nicholson also unequivocally stated that notwithstanding those severe potential penalties, he wished to go forward with trial.  Without any other evidence to support his self-serving assertion that his counsel advised him that "if he were to reject the government's plea offer and instead proceed to trial [] his sentencing exposure would be 'no more than 35 years,'" the objective prong is not satisfied.  In short, Nicholson received accurate

14

information about his sentencing exposure and therefore made an informed choice to go to trial rather than accepting the government's plea offer.  (ECF No. 780, PageID.11527.)

The somewhat nuanced argument Nicholson makes in his reply brief does not change the analysis.  In that filing, Nicholson argued:

> Nicholson does not claim that counsel told him that the maximum by statute he could face was 35 years.  Instead, he maintains that counsel told him that he should reject the government's 30 year plea offer because "I would receive no more than 35 years in prison, that is, assuming I were to be found guilty at trial."

(ECF No. 801, PageID.11614.)  This is a somewhat different argument than the one Nicholson originally alleged in his § 2255 motion, which focused, at least in part, on his potential sentencing "exposure" as opposed to what he was allegedly told about the maximum sentence he "would receive."   Indeed, Nicholson's first argument begins, "[t]rial counsel provided ineffective assistance when he misinformed Mr. Nicholson *of the maximum sentence exposure he faced at trial* versus entering a guilty plea."  (ECF No. 780, PageID.11526) (emphasis added).  As the Court just demonstrated, the salient transcripts belie that argument.  But even considering Nicholson's nuanced explanation of his argument, the bottom line is still that he was clearly advised, on the record, that the 35-year sentence was the "minimum" sentence he would face if he was convicted, and that he could be sentenced "up to life" as to certain of the charges.  Thus, at the time Nicholson decided to forego the plea offer, he knew that his sentencing exposure was not capped at 35 years. *See Smith v. United States*, 348 F.3d 545, 553 (6th Cir. 2003) (holding that counsel provides effective assistance where he explains the "sentencing exposure the defendant will face as a consequence of exercising each of the options available.").

Moreover, even if Nicholson could satisfy the objective prong of the *Strickland* test, his claim would fail on the prejudice prong.  Nicholson's self-serving assertion about a purported

capped sentence that is explicitly at odds with the hearing transcripts discussed above is not sufficient to establish prejudice.  *Moore v. United States*, 676 F. App'x 383, 387 (6th Cir. 2017) (petitioner's "self-serving, conclusory statement – indicating that he would have gone to trial had he known the [alleged misrepresented information]" insufficient to establish "prejudice"); *Kue v. Birkett,* No. 2:10-CV-11925, 2013 WL 2155527, at *10 (E.D. Mich. May 17, 2013) (a "petitioner's conclusory allegation that, but for an alleged attorney act or omission he [] would not have pleaded guilty, is [] insufficient to prove [prejudice].")  The Court also notes that this is not a case where, as a result of supposed ineffective assistance, the defendant received a sentence substantially higher than what he is now contending he believed was the maximum sentence he would receive. Nicholson has offered nothing to substantiate his contention that he was willing to go to trial when he believed his maximum sentence was 35 years, but that he would have pleaded guilty and accepted a 30-year sentence had he known he would be sentenced to 40 years in prison.  Because Nicholson has not shown a reasonable probability that but for his counsel's allegedly deficient performance he would have pleaded guilty, he cannot show he suffered any prejudice.  *Lafler*, 566 U.S. at 164; *Strickland*, 466 U.S. at 694.

For the foregoing reasons, Nicholson failed to show his trial counsel provided ineffective assistance with respect to advising him as to his sentencing exposure.

### 2. *Ineffective Assistance of Counsel on Appeal*

Nicholson next argues that his appellate counsel was ineffective when he failed to raise a claim based on *Dean v. United States*, 137 S.Ct. 1170 (2017), which the Supreme Court decided on April 3, 2017, *after* Nicholson was convicted and *after* his attorney filed his appellate brief.  In *Dean*, the Supreme Court held that a sentencing court has discretion to consider the § 924(c)

16

mandatory minimum sentence for using a firearm in connection with a violent or drug trafficking crime when determining the sentence to be imposed for the predicate offense. *Id.* at 1178.

This argument lacks merit. First, because *Dean* was decided after Nicholson's sentencing, it is not a proper claim under Section 2255. As one federal district court recently explained, "*Dean* does not apply to a Section 2255 Motion because *Dean* cannot be applied retroactively to cases on collateral review. . . . Because Dean was decided after Movant was sentenced, its holding does not apply retroactively to his Section 2255 Motion." *Scott v. United States*, No. 4:18CV303 HEA, 2020 WL 4192450, at *7 (E.D. Mo. July 21, 2020) (citing *Reed v. United States*, No. 1:17-CV-181, 2018 WL 1064573, *2 (E.D. Mo. Feb. 23, 2018); *Simmons v. Terris*, No. 17–CV–11771, 2017 WL 3017536, at *2 (E.D. Mich. July 17, 2017); *In re Dockery*, No. 17–50367, 2017 WL 3080914, at * 1 (5th Cir. July 20, 2017) (denying certification because the defendant had not "made a prima facie showing that *Dean* announced a new rule of constitutional law that was made retroactive to cases on collateral review")).

Moreover, even if Nicholson's appellate counsel should have sought leave to file a supplemental appellate brief, Nicholson fails to satisfy the *Strickland* test's prejudice prong. According to *Strickland*, Nicholson must "affirmatively prove prejudice." *Strickland*, 466 U.S. at 693. Examining the allegations raised by Nicholson, the strongest support for his claim is his assertion that,

> To be sure, the Court acknowledged its authority under the guidelines to vary in Nicholson's sentence on the count with no minimum mandatory when it sentenced him to 60 months but this does not mean that it would not have varied down to 1 day, as allowed under *Dean*, on this count if the Court thought the government would not appeal the reasonableness of such a variance.

(ECF No. 801, PageID.11615.)

17

This speculative argument fails to establish prejudice.  As the government notes, "[i]t is difficult to imagine the Court imposing a much more advantageous sentence than the one Nicholson received. . . . [T]he court imposed a sentence of 60 months – one-quarter of the bottom of the guideline range."  (ECF No. 786, PageID.11558.)  Indeed, a review of the sentencing transcript shows no likelihood that, even after *Dean*, Judge Borman would have sentenced Nicholson to a lesser sentence.  For one, Judge Borman recognized that the *minimum* sentence he could impose was 35 years.  (ECF No. 706, PageID.9362-63.)  Thus, given the 40-year overall sentence Nicholson received, there is only a five-year difference between that sentence and the *minimum* sentence Nicholson could have received.  Judge Borman went on to explain how the Section 3553(a) factors merited imposing an *additional* term of incarceration as to the many underlying convictions (Counts 1, 5, 8, 9, 10, and 12), noting: (1) the "nature and circumstances of the offenses of conviction" were "very serious;" (2) that Nicholson "had a significant role in the Phantom motorcycle gang, a very significant role;" and (3) "[t]here's a need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law and provide just punishment for the offense, also to adequately deter criminal conduct and at this stage to protect the public from further crimes of this Defendant."  (*Id.*)  Again, Judge Borman imposed a sentence of 5 years (60 months) as to these other charges, which he noted was "a very significant downward variance in departure under the guidelines . . ."  (*Id.*, PageID.9363-64.)  Judge Borman explained this was the appropriate sentence, taking a wholistic view of Nicholson's specific involvement in the PMC conspiracy, noting it was "sufficient but not greater than necessary to deal with the convictions in this case."  (*Id.*, PageID.9364.)  In short, Nicholson provides no reasonable basis for concluding that even considering *Dean*, Judge Borman would have imposed a sentence of less than five years on the many underlying Counts.

18

For the foregoing reasons, Nicholson failed to show his appellate counsel provided ineffective assistance when he did not raise a claim based on *Dean*.

3.  *Counts Seven (7) and Eleven (11)*

The final argument raised by Nicholson in his § 2255 motion is that he is "actually innocent as convicted on Counts seven and eleven" – the two § 924(c) charges – because the predicate violations of § 1959(a)(3), § 1959(a)(6), and § 111(b) "fail to categorically qualify as 'crimes of violence' for the purposes of § 924(c)."  (ECF No. 780, PageID.11532.)  In both Counts Seven and Eleven, Nicholson is charged with Use and Carry of a Firearm During, and in Relation to, a Crime of Violence, in violation of 18 U.S.C. § 924(c).  (ECF No. 201, PageID.1680, 1683.) Section 924(c) provides in relevant part:

> any person who, during and in relation to any crime of violence or drug trafficking crime (including a crime of violence or drug trafficking crime that provides for an enhanced punishment if committed by the use of a deadly or dangerous weapon or device) for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime—
>
> (i) be sentenced to a term of imprisonment of not less than 5 years;
>
> (ii) if the firearm is brandished, be sentenced to a term of imprisonment of not less than 7 years; and
>
> (iii) if the firearm is discharged, be sentenced to a term of imprisonment of not less than 10 years.

18 U.S.C. § 924(c)(1)(A)(i-iii).

Count Seven relates to the shooting of McGee, with the predicate offenses being the violations of § 1959(a)(3) and § 1959(a)(6) (Counts Five and Six), while Count Eleven relates to the shooting that occurred when federal agents executed the search warrant at Nicholson's residence, with the predicate offense being violation of § 111(b) (Count Nine).  Thus, the Court

19

must examine the underlying "predicate offenses" to these two charges to determine whether they constitute "crimes of violence."

The term "crime of violence" is defined, for purposes of § 924(c), as a felony that:

(A) has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or

(B) that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

18 U.S.C. § 924(c)(3)(A), (B).

These two clauses in §924(c) have been coined the "elements clause" (§ 924(c)(3)(A)) and the "residual clause" (§ 924(c)(3)(B)).  In *United States v. Davis*, 139 S. Ct. 2319, 2336 (2019), the U.S. Supreme Court held that the residual clause is unconstitutionally vague and therefore invalid; however, the elements clause remains intact.  The Court thus proceeds to analyze Nicholson's arguments only under the elements clause, which requires it to apply an "elements-based categorical approach" rather than consider "the specific means by which the defendant committed the crime." *United States v. Evans*, 848 F.3d 242, 245-46 (4th Cir. 2017); *United States v. Fuertes*, 805 F.3d 485, 498 (4th Cir. 2015).

The Court agrees with the government that "[e]ach of the three crimes underlying Nicholson's two § 924(c) charges qualifies as a crime of violence under the force clause in § 924(c)(3)(A)."  (ECF No. 786, PageID.11558.)  In Count Five, Nicholson was charged with Assault with a Dangerous Weapon in Aid of Racketeering, in violation of 18 U.S.C. §§ 1959(a)(3); 2.  (ECF No. 201, PageID.1678.)  That charge of the indictment specifically alleges that Nicholson (and the other co-defendants) "did, for the purpose of maintaining and increasing position in the Phantoms, an enterprise engaged in racketeering activity, knowingly and unlawfully assault L.M. with a dangerous weapon; in violation of Michigan Compiled Laws, Sections 750.82 and 767.39."

20

(*Id.*, PageID.1678-79.)  In Count Six, Nicholson was charged with Conspiracy to Assault with a Dangerous Weapon in Aid of Racketeering, in violation of 18 U.S.C. § 1959(a)(6).  (*Id.*, PageID.1679.)  As to that charge, the indictment alleges that Nicholson (and his co-defendants) "did, for the purpose of maintaining and increasing position in the Phantoms, an enterprise engaged in racketeering activity, knowingly and unlawfully conspire to assault members of the Satan Sidekicks with a dangerous weapon, in violation of Michigan Compiled Laws, Sections 750.82, 750.157a(a), and 767.39." (*Id.*, PageID.1679-80.)  Count Nine of the indictment charges Nicholson with Assaulting, Resisting, or Impeding Certain Officers or Employees with a Dangerous Weapon," in violation of 18 U.S.C. § 111(b).  (*Id.*, PageID.1682.)  That Count specifically alleged that Nicholson "knowingly, and by means and use of a dangerous weapon, to wit: a firearm, did forcibly assault, resist, oppose, impede, intimidate, and interfere with officers and employees of an agency of the United States Government . . ." (*Id.*)

The Court first addresses the §§ 1959(a)(3), (a)(6) charges involving assault with a dangerous weapon in violation of Michigan law.  Michigan defines assault with a dangerous weapon as an assault of "another person with a gun, revolver, pistol, knife, iron bar, club, brass knuckles, or other dangerous weapon without intending to commit murder or inflict great bodily harm less than murder." M.C.L. § 750.82(1).  The elements are as follows: "(1) an assault, (2) with a dangerous weapon, and (3) with the intent to injure or place the victim in reasonable apprehension of an immediate battery." *People v. Jackson*, 487 Mich. 783, 790 (2010).  It has been well established that Michigan's assault with a dangerous weapon—otherwise known as "felonious assault"— qualifies as a "crime of violence" under the elements clause, because one cannot assault a person, or jeopardize his or her life with a dangerous weapon, unless one uses, attempts to use, or threatens physical force. *See Harris v. United States*, 853 F.3d 318, 320 (6th

Cir. 2017); *United States v. Walker*, 14-cr-20388, 2017 WL 131554 (E.D. Mich., Jan. 13, 2017) (holding, "[b]ecause felonious assault in Michigan necessarily has an element the use, attempted use, or threatened use of physical force against eh person of another, it [is] properly counted as a crime of violence, and Defendant is not entitled to resentencing.").

Thus, the predicate offenses of assault with a dangerous weapon categorically qualify as crimes of violence under 18 U.S.C. § 924(c)(3)(A), and support Nicholson's conviction on Count Seven.

The analysis is similar as to Nicholson's § 924(c) conviction based on the underlying § 111(b) charge in Count Nine. 18 U.S.C. § 111(b) provides, "Whoever, in the commission of any acts described in subsection (a)[6], uses a deadly or dangerous weapon (including a weapon intended to cause death or danger but that fails to do so by reason of a defective component) or inflicts bodily injury, shall be fined under this title or imprisoned not more than 20 years, or both. As the Sixth Circuit has explained, § 111(b) is categorically a crime of violence:

> In *United States v. Rafidi*, we analyzed [ ] [w]hether the "crime of violence" element of § 924(c)(3) could be satisfied by a predicate offense, 18 U.S.C. § 111(b), that required proof of forcible assault and use of a deadly or dangerous weapon during the commission of the assault. 829 F.3d at 443–45. We specifically considered whether the deadly or dangerous weapon element in 18 U.S.C. § 111(b) necessarily made the offense a crime of violence. *Id.* at 445. We held that "if a defendant commits a violation of [18 U.S.C.] § 111 through intentionally causing physical contact with the federal officer—even if this physical contact is not in itself 'capable of causing physical pain or injury'—§ 111(b)'s additional required element of using a deadly weapon during this encounter would elevate this lower degree of physical force into 'violent force' sufficient to establish § 111(b) as a 'crime of violence.'" *Id.* at 446 (quoting Johnson, 559 U.S. at 140, 130 S.Ct. 1265). More recently, in *Knight v. United States*, we applied *Rafidi* to hold that the

---

[6] A person violates subsection if he: "(1) forcibly assaults, resists, opposes, impedes, intimidates, or interferes with any person designated in section 1114 of this title while engaged in or on account of the performance of official duties; or (2) forcibly assaults or intimidates any person who formerly served as a person designated in section 1114 on account of the performance of official duties during such person's term of service . . ." 18 U.S.C. § 111(a).

aggravated offense within 18 U.S.C. § 2114(a)—which sets forth an increased punishment for putting an assault victim's life in jeopardy by use of a dangerous weapon—was categorically a crime of violence under § 924(c)(3)(A).  936 F.3d 495, 498–99 (6th Cir. 2019).  Our reasoning was similar to that of *Rafidi*: Because the underlying offense "require[d] at least some force or threatened use of force, ... the use of a dangerous weapon to put the victim's life in jeopardy transforms the force into violent physical force."  *Id.* at 500.

*Manners v. United States*, 947 F.3d 377, 381 (6th Cir. 2020).

Accordingly, the § 111(b) predicate offense against Nicholson categorically qualifies as a crime of violence under 18 U.S.C. § 924(c)(3)(A), and supports Nicholson's conviction on Count Eleven.

Finally, the Court turns to an argument Nicholson raised in his August 28, 2019 supplemental filing.  (ECF No. 811.)  Nicholson brought to the Court's attention two issues.  First, he correctly notes that in *Davis*, 139 S.Ct. 2319, the U.S. Supreme Court declared 18 U.S.C. § 924(c)(3)(B) – the statute's residual clause – to be unconstitutionally vague.  (ECF No. 811, PageID.11674).  But that does not change the above analysis which involved § 924(c)(3)(A)'s elements clause.

Second, Nicholson cites *United States v. Ledbetter*,[7] 929 F.3d 338 (6th Cir. 2019), for the proposition that his Count Seven § 924(c)(3)(A) conviction must be overturned because "numerous courts, including the Sixth Circuit [have] made it clear that RICO Conspiracy and Racketeering Conspiracy no longer meets [that] clause."  (ECF No. 811, PageID.11674.)  In other words, Nicholson is claiming that "RICO Conspiracy and Racketeering Conspiracy no longer" constitute predicate "crimes of violence" that could support his § 924(c) conviction.  (*Id.*)  That argument is flawed.

In *Ledbetter*, the Sixth Circuit explained:

---

[7] Nicholson refers to this case as *U.S. v. Ussury, et al.*, but its formal caption is *U.S. v. Ledbetter*.

> For their participation in the Cunningham home invasion and Moon murder, Harris and Robinson were also convicted of murder by firearm during a crime of violence, 18 U.S.C. § 924(c), (j)(1). Here, the purported "crime of violence" was conspiracy to commit Hobbs Act robbery, which makes it a crime to conspire to "in any way or degree obstruct[ ], delay[ ], or affect[ ] commerce or the movement of any article or commodity in commerce, by robbery." 18 U.S.C. § 1951(a). Section 924(c)(3) defines "crime of violence" in two ways, but the parties agree that conspiracy to commit Hobbs Act robbery qualifies ***only if it meets § 924(c)(3)(B)'s residual definition***. By that definition, a "crime of violence" is a felony offense "that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." § 924(c)(3)(B).

> Harris and Robinson argue that their convictions under § 924(c) must be set aside because § 924(c)(3)(B)'s residual clause is unconstitutionally vague. The Supreme Court has now held that § 924(c)(3)(B)'s residual definition is unconstitutionally vague. *See United States v. Davis* []. Because the Government relies only on that now-invalidated clause to support Harris's and Robinson's convictions under § 924(c), those convictions must be set aside.

*Ledbetter*, 929 F.3d at 360–61 (emphasis added).

Nicholson's case is different because, whereas the predicate "crime of violence" offense in *Ledbetter* was conspiracy to commit Hobbs Act robbery, which could only qualify under subsection (c)(3)(B), here, for the reasons explained above, the predicate "crimes of violence" charges against Nicholson are, in fact, categorical "crimes of violence" under § 924(c)(3)(A)'s elements clause.

Recent Sixth Circuit case law confirms that the RICO Conspiracy and Racketeering Conspiracy charges of which Nicholson was convicted can constitute predicate "crimes of violence" supporting a § 924(c) conviction. For example, in the analogous case of *United States v. Frazier*, 790 F. App'x 790, 791 (6th Cir.), cert. denied, 141 S. Ct. 314, 208 L. Ed. 2d 62 (2020), the Sixth Circuit explained:

> On remand, Frazier argues that his conviction under § 924(c) should be reversed because § 1959(a)(3) is not a "crime of violence" falling within § 924(c)(3)(A)'s elements clause. Our recent precedent forecloses this

argument. *Manners v. United States*, No. 17-1171, 947 F.3d 377, 2020 WL 130432 (6th Cir. Jan. 13, 2020). *Manners* held that assault with a dangerous weapon in aid of racketeering under § 1959(a)(3) categorically involves the use, attempted use, or threatened use of force capable of causing physical pain or injury to another person. *Id.* at 382, at 4.

*Frazier*, 790 F. App'x at 791.

Accordingly, because the Sixth Circuit has already found that the government presented sufficient evidence at trial from which "a rational jury could conclude that defendants [including Nicholson] were guilty of assault with a dangerous weapon in aid of racketeering and infer a conspiracy to do the same" (ECF No. 751, PageID.11404), Nicholson's conviction of those crimes may serve as the predicate "crime of violence" necessary to support his § 924(c) conviction in Count Seven. *Frazier*, 790 F. App'x at 791.

### 4.    *Rehaif v. United States*

In his Motion of Addendum, Nicholson seeks to add an additional vague argument about the *Rehaif* case that the Supreme Court decided while his § 2255 motion was pending before this Court. (ECF No. 835.)  Nicholson's motion is unavailing as *Rehaif* has no application whatsoever to his case.  In *Rehaif*, the defendant had been in the United States on a student visa, but after his immigration status was terminated he remained in the country.  Rehaif then visited a firing range, where he shot two firearms.  "The Government learned about his target practice and prosecuted him for possessing firearms as an alien unlawfully in the United States, in violation of § 922(g) and § 924(a)(2)." *Rehaif*, 139 S. Ct. at 2194.  § 924(a)(2) says that "[w]hoever knowingly violates" certain subsections of § 922, including § 922(g), "shall be" subject to penalties of up to 10 years' imprisonment.  In turn, § 922(g) provides that it "shall be unlawful for any person ..., being an alien ... illegally or unlawfully in the United States," to "possess in or affecting commerce, any firearm or ammunition."  A jury convicted Rehaif and he appealed, arguing that the jury had been improperly instructed that it did not need to find that he knew he was in the country unlawfully

when he shot the firearms.  The Court of Appeals for the Eleventh Circuit, however, found no issue with the jury instruction, and affirmed Rehaif's conviction.  The U.S. Supreme Court reversed, holding, "in a prosecution under 18 U.S.C. § 922(g) and § 924(a)(2), the Government must prove both that the defendant knew he possessed a firearm and that he knew he belonged to the relevant category of persons barred from possessing a firearm."  *Rehaif*, 139 S. Ct. at 2200.

Nicholson makes no cogent argument about how the holding in *Rehaif* applies to his convictions for violating § 924(c).  Presumably, though, he is arguing that he did not know any of his predicate offenses were "crimes of violence," just as Rehaif had argued he did not know he belonged to the category of persons prohibited from possessing a firearm.  But any such argument by Nicholson fails because, unlike the § 924(a)(2) charge that Rehaif faced, the text of § 924(c) has no "knowledge" requirement about the predicate act.  As explained in a recent similar case, "*Rehaif* is inapplicable here and does not affect § 924(c).  Section 924(c) does not have an element of personal status; it has an element of the legal classification of the underlying crime.  [The defendant] does not get relief from this conviction simply because he did not know at the time of the offense that federal carjacking is a crime of violence."  *United States v. Sampo*, No. 3:17-CR-00143-SLG, 2020 WL 7634161, at *4 (D. Alaska Dec. 22, 2020).  *See also United States v. Tatum*, No. CR DKC 13-0492-001, 2021 WL 795158, at *17 (D. Md. Mar. 2, 2021) (holding that *Rehaif* "is entirely inapplicable to [the defendant's] conviction under § 924(c).").  Moreover, "the Supreme Court has not made *Rehaif* retroactive to cases on collateral review."  *Pierce v. United States*, No. 4:17-CR-00256-RBH-1, 2020 WL 774404, at *4 (D.S.C. Feb. 18, 2020) (citing *In re Wright*, 942 F.3d 1063, 1064 (11th Cir. 2019); *In re Palacios*, 931 F.3d 1314 (11th Cir. 2019).).  *See also Dixon v. Adams*, No. 1:20-CV-564, 2020 WL 8571661, at *2 (W.D. Mich. Dec. 2, 2020).

26

For all of these reasons, the argument raised in Nicholson's Motion of Addendum (ECF No. 835) fails.

### D.      Conclusion

For the foregoing reasons, **IT IS RECOMMENDED** that Nicholson's Motion under § 2255 to Vacate, Set Aside, or Correct Sentence **(ECF Nos. 780, 835)** be **DENIED**.

### E.      Certificate of Appealability

When considering a § 2255 motion, this Court "must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11 of the Rules Governing Section 2255 Proceedings for the United States District Courts. A petitioner must obtain a certificate of appealability ("COA") before he may appeal the denial of his § 2255 motion. 28 U.S.C. § 2253(c)(1)(B). A COA will issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). In cases like Nicholson's where the petitioner's claims are rejected on their merits, a movant "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong" to warrant a COA. *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Here, for all of the reasons stated above, the Court finds that Nicholson did not make "a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and cannot satisfy the *Slack* criteria. Accordingly, the Court should deny Nicholson a certificate of appealability.


Dated: March 31, 2021                                    s/David R. Grand
Ann Arbor, Michigan                                     DAVID R. GRAND
                                                        United States Magistrate Judge


### NOTICE TO THE PARTIES REGARDING OBJECTIONS

Within 14 days after being served with a copy of this Report and Recommendation and Order, any party may serve and file specific written objections to the proposed findings and

recommendations and the order set forth above.  *See* 28 U.S.C. §636(b)(1); Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d)(1).  Failure to timely file objections constitutes a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140, (1985); *United States v. Sullivan,* 431 F.3d 976, 984 (6th Cir. 2005).  Only specific objections to this Report and Recommendation will be preserved for the Court's appellate review; raising some objections but not others will not preserve all objections a party may have.  *See Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987); *see also Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596-97 (6th Cir. 2006).  Copies of any objections must be served upon the Magistrate Judge.  *See* E.D. Mich. LR 72.1(d)(2).

A party may respond to another party's objections within 14 days after being served with a copy.  *See* Fed. R. Civ. P. 72(b)(2); 28 U.S.C. §636(b)(1).  Any such response should be concise, and should address specifically, and in the same order raised, each issue presented in the objections.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on March 31, 2021.

s/Eddrey O. Butts
EDDREY O. BUTTS
Case Manager